Jason R. Melzer (027742003)
Elizabeth A. Carbone (116052014)
**COLE SCHOTZ P.C.**
Court Plaza North
25 Main Street, P.O. Box 800
Hackensack, New Jersey  07602-0800
201-489-3000
201-489-1536 Facsimile
*Attorneys for Plaintiff, Redi-Data, Inc.*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| REDI-DATA, INC., | Civil Action No. 2:20-cv-17484-JMV-JBC |
| Plaintiff, | |
| | <u>Civil Action</u> |
| v. | *Oral Argument Requested* |
| | Return date: February 22, 2022 |
| THE SPAMHAUS PROJECT *a/k/a* THE SPAMHAUS PROJECT LTD., | |
| Defendant. | |

---

## BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(2)

---

Of Counsel and On the Brief:
    Jason R. Melzer
    Elizabeth A. Carbone

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF FACTS AND RELEVANT PROCEDURAL HISTORY ............................. 4

LEGAL ARGUMENT.......................................................................................... 5

    I.      THE STANDARD ON MOTION TO DISMISS PURSUANT TO RULE 12(B)(2)........................................................................................... 5

    II.     THIS COURT CAN AND SHOULD ASSERT PERSONAL JURISDICTION OVER DEFENDANT................................................ 6

          A.     The Court Can Exercise Specific Jurisdiction Over Defendant................. 7

                1.     Defendant Purposefully Directed Activities To New Jersey. ......... 8

                2.     This Litigation "Arises Out Of" The Foregoing Activities. ......... 15

                3.     The Notions Of Fair Play And Substantial Justice Clearly Weigh In Favor Of This Court's Exercise Of Personal Jurisdiction Over Defendant. ......................................... 16

          B.     The *Calder* Effects Test Applies Here..................................... 17

    III.    ALTERNATIVELY, JURISDICTIONAL DISCOVERY IS APPROPRIATE.................................................................. 23

CONCLUSION................................................................................. 24

# TABLE OF AUTHORITIES

**Cases**                                                             **Page(s)**

*Adam Techs. LLC v. Well Shin Tech. Co., Ltd.*,
No. 18-cv-10513, 2019 WL 3800236 (D.N.J. Aug. 13, 2019) ..................................7

*Am. Bd. of Internal Med. v. Rushford*,
No. 14-cv-6428, 2015 WL 5164791 (D.N.J. Sept. 2, 2015)............................14, 15

*Back2Health Chiropractic Ctr., LLC v. Sentienl Ins. Co., Ltd.*,
No. 20-cv-6717, 2021 WL 960875 (D.N.J. Mar. 15, 2021) .....................................5

*Calder v. Jones*,
465 U.S. 783 (1984)...............................................................3, 4, 18, 19, 20

*Christie v. Nat'l Inst. for Newman Studies*,
258 F. Supp. 3d 494 (D.N.J. 2017) .............................8, 16, 17, 20, 21, 22

*DatabaseUSA.com LLC v. The Spamhaus Project*,
19-cv-00423-JFB-CRZ (D. Neb.) ...................................................2, 11

*e360 Insight et al. v. The Spamhaus Project*,
No. 06-cv-3958-CPK (N.D. Ill.) .....................................................2, 12

*Green v. William Mason & Co.*,
996 F. Supp. 394 (D.N.J. 1998) ...........................................................17

*Manship v. Stein*,
No. 21-cv-10389, 2022 WL 203247 (D.N.J. Jan. 24, 2022)............................8, 16

*MaxLite, Inc. v. ATG Elec., Inc.*,
193 F. Supp. 3d 371 (D.N.J. 2016) .............................................5, 18, 19

*Mellon Bank (E.) PSFS, Nat'l Ass'n v. Farino*,
960 F.2d 1217 (3d Cir. 1992).................................................................5

*Miller Yatch Sales, Inc. v. Smith*,
384 F.3d 93 (3d Cir. 2004)...........................................................6, 14, 16

*N.J. D.E.P. v. E.I. du Pont de Nemours & Co.*,
Nos. 19-cv-14758, 19-cv-14765, 19-cv-14766, & 19-cv-14767, 2021 WL
6064842 (D.N.J. Dec. 20, 2021) .........................................................23

*O'Connor v. Sandy Lane Hotel Co., Ltd.*,
496 F.3d 312 (3d Cir. 2007)..................................................................7

*Oticon, Inc. v. Sebotek Hearing Sys., LLC*,
865 F. Supp. 2d 501 (D.N.J. 2011) .......................................................19

*Parkway-Kew Corp. v. Harris Machine Tools, Inc.*,
    No. 20-cv-6044, 2020 WL 6375790 (D.N.J. Oct. 30, 2020) .............................................14, 15

*Strategic Prod. & Serv., LLC v. Integrated Media Tech., Inc.*,
    No. 18-cv-00694, 2019 WL 2067551 (D.N.J. May 10, 2019)..................................................18

*Toys "R" Us, Inc. v. Step Two, S.A.*,
    318 F.3d 446 (3d Cir. 2003)....................................................................................................23

*Vectra Visual, Inc. v. Hoving*,
    No. 21-cv-03296, 2021 WL 4520339 (D.N.J. Oct. 4, 2021) ...........................................5, 6, 7

*Zippo Mfg. Co. v. Zippo Dot Com, Inc.*,
    952 F. Supp. 1119 (W.D. Pa. 1997)........................................................................................9

28662/0002-42371622v3

Plaintiff, Redi-Data, Inc. ("*Redi-Data*"), respectfully submits this brief in opposition to defendant, The Spamhaus Project *a/k/a* The Spamhaus Project Ltd.'s ("*Defendant*") motion to dismiss the complaint filed on November 30, 2020 (the "*Complaint*") [Doc. No. 1] for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) ("*Rule 12(b)(2)*") [Doc. No. 15].

## PRELIMINARY STATEMENT

Defendant portrays itself as a "white knight" of the Internet; a stalwart purveyor of tools and services to assist users against an increasing tide of spam, Phishing, and viruses. Redi-Data has no problem with this mission. In fact, Redi-Data applauds Defendant's efforts and recognizes the value in same. Nevertheless, no matter how well-intentioned Defendant's mission is, Defendant's overly broad approach to combating Internet abuses has, and continues to, mislabel legitimate businesses as "spammers." These actions have destructive consequences. Worse yet, when such errors are brought to Defendant's attention, Defendant's actions appear to generally consists of a "too bad" approach. As Redi-Data will explain and prove at the appropriate juncture, it is neither a "spammer" nor should its domain name or Internet protocol addresses ("*IP addresses*") have been repeatedly listed on Defendant's blocklists (which Defendant is well aware, and intends, to have an impact and effect on a target's email traffic). The discrete issue before the Court at this juncture is whether personal jurisdiction can be constitutionally and fairly exercised over Defendant in this Judicial District. As demonstrated below, it can be.

Indeed, Redi-Data is not the only company that has been inappropriately targeted by, and suffered the destructive effects of, Defendant's tools and services and sued Defendant in the United States. To the contrary, on July 21, 2006 Defendant removed a lawsuit that was filed in the Circuit Court of Cook County, Chancery Division, State of Illinois to the United States

District Court for the Northern District of Illinois that involved allegations that the plaintiffs were erroneously identified on Defendant's ROKSO list and ignored demands that the plaintiffs be removed from same. *See generally e360 Insight, LLC et al. v. The Spamhaus Project*, 06-cv-03958-CPK (N.D. Ill.).  Defendant answered the complaint and initially defended the action without challenging personal jurisdiction, then temporarily withdrew from the action causing a default that resulted in the issuance of an injunction. *See generally e360 Insight, LLC et al. v. The Spamhaus Project*, 06-cv-03958-CPK (N.D. Ill.), Order [Doc. No. 24].  Defendant thereafter re-appeared and, among other things, challenged jurisdiction, which was denied.  The case concluded in a judgment against Defendant.

Similarly, in 2019 a lawsuit was commenced in the United States District Court for the District of Nebraska by DatabaseUSA.com LLC against Defendant based on Defendant erroneously including the company's domain names on its blocklists and refusing to remove same. *See generally DatabaseUSA.com LLC v. The Spamhaus Project*, 19-cv-00423-JFB-CRZ (D. Neb.).  Jurisdiction in that action was alleged to be based on Defendant's effect on business in the jurisdiction and its direct electronic communications with the plaintiff. *DatabaseUSA.com LLC v. The Spamhaus Project*, 19-cv-00423-JFB-CRZ (D. Neb.), Compl. [Doc. No. 1].  Ultimately, the District of Nebraska found, based on further evidence presented in an affidavit from one of the plaintiff's corporate officers, that jurisdiction was proper over Defendant as "defendant knowingly engaged in activities in the State of Nebraska by selling internet services to providers who do business in Nebraska." *DatabaseUSA.com LLC v. The Spamhaus Project*, 19-cv-00423-JFB-CRZ (D. Neb.), Order [Doc. No. 16].  A judgment and permanent injunction was issued against Defendant. *DatabaseUSA.com LLC v. The Spamhaus Project*, 19-cv-00423-

JFB-CRZ (D. Neb.), Judgment [Doc. No. 34] & Permanent Injunction [Doc. No. 35].  An exercise of personal jurisdiction over Defendant is likewise appropriate here.

As the Court is aware, in considering motions to dismiss for lack of personal jurisdiction, this Court (generally stated) is tasked with determining whether an exercise of personal jurisdiction under the specific circumstances of the case would comport with both due process and fundamental fairness concerns.  *See* Section I, *infra*.  To aid in this evaluation, a court may consider the allegations asserted in the complaint as well as any other evidence outside of the pleadings offered in the context of the motion (or is otherwise judicially noticeable).  If a court makes a personal jurisdictional determination without an evidentiary hearing, the plaintiff need only make a *prima facie* showing that an exercise of jurisdiction is appropriate.  Moreover, any allegations made in the complaint and factual disputes must be construed in favor of the plaintiff – here, Redi-Data.

As described more fully herein and alleged in the declarations submitted herewith, this Court can exercise specific jurisdiction over Defendant, either under a traditional analysis or under the analysis set forth in *Calder v. Jones*, 465 U.S. 783 (1984).  *See* Section II, *infra*.  As the record reflects, Defendant runs an interactive website that is accessible to, and used by, businesses operating in New Jersey, including, without limitation, Internet service providers ("*ISPs*").  *See* Section II(A), *infra*.  Risking redundancy, personal jurisdiction over Defendant was previously found in the United States District Court for the Northern District of Illinois on this basis.  Moreover, Defendant has electronically communicated with individuals and businesses residing or operating in New Jersey about Redi-Data and its blocklists as well as directly to Redi-Data and, by its own records, investigated Redi-Data's business.  These deliberate contacts indisputably arise out of or relate to the lawsuit at issue.  Furthermore,

Defendant has not, and cannot, assert any significant countervailing fairness concerns that would defeat personal jurisdiction.  In contrast, if this Court were to decline jurisdiction, Redi-Data would be left without a venue to protect its rights and business.  As such, specific jurisdiction can be exercised over Defendant under a traditional analysis.

Personal jurisdiction is also appropriate under *Calder v. Jones*, which applies here given the intentional torts alleged in the Complaint.  *See* Section II(B), *supra*.  As the email communications appended to the Buckley Declaration evidence, since May 2016 Defendant has been aware (or, at the very least, should have been aware) that Redi-Data is located in New Jersey.  Even if not, which is unlikely, surely Defendant came across this information in its review of Redi-Data's website referenced in a 2020 ROKSO list.  Defendant has also been aware that its actions have been harming Redi-Data, which harm is indisputably felt in New Jersey (where Redi-Data is located and conducts business).  Defendant was advised of this via a June 19, 2018 demand letter, which also refers to New Jersey (*e.g.*, Cole Schotz P.C.'s address for replies), and May 2020 email communications involving Amazon.  Yet, despite this, Defendant has continued to refuse to alter its actionable behavior or justify its blocklist listings.  In short, Defendant's actions evidence tortious conduct that is expressly aimed at Redi-Data.  If nothing else, jurisdictional discovery is warranted and appropriate.  *See* Section III, *infra*.

For all of these reasons, which are elaborated on below, Defendant's motion should be denied.

## STATEMENT OF FACTS AND RELEVANT PROCEDURAL HISTORY

For the sake of brevity, Redi-Data incorporates by reference herein the: (i) well-plead allegations set forth in the Complaint; (ii) the Declaration of Thomas Buckley dated January 28, 2022 (the "*Buckley Declaration*"); (iii) the Declaration of Elizabeth Carbone dated January 31, 2022 (the "*Carbone Decl.*"); (iv) the contents of any exhibits appended to either the Buckley

Declaration or the Carbone Declaration; and (v) and the admissions made in the Declaration of

Stephen John Linford dated December 22, 2021 (the "_Linford Decl._") [Doc. No. 15-2].

## LEGAL ARGUMENT

### I.      THE STANDARD ON MOTION TO DISMISS PURSUANT TO RULE 12(b)(2).

A "court may assert personal jurisdictional over a nonresident defendant of the state in

which the court sits to the extent authorized by the law of the state" provided that such an

exercise "comports with the Due Process Clause of the Fourteenth Amendment." _Vectra Visual,_

_Inc. v. Hoving_, No. 21-cv-03296, 2021 WL 4520339, at *3 (D.N.J. Oct. 4, 2021) (citation and

quotations omitted).  If a defendant challenges jurisdiction through a motion to dismiss under

Rule 12(b)(2), "the plaintiff 'bears the burden of demonstrating the facts that establish personal

jurisdiction.'"  _Back2Health Chiropractic Ctr., LLC v. Sentienl Ins. Co., Ltd_., No. 20-cv-6717,

2021 WL 960875, at *3 (D.N.J. Mar. 15, 2021) (citation omitted).  Such facts may be established

by "affidavits or other competent evidence that jurisdiction is proper[,]" and "all disputed facts"

must be construed "in favor of plaintiff."  _Id._ (citations and quotations omitted); _MaxLite, Inc. v._

_ATG Elec., Inc_., 193 F. Supp. 3d 371, 382 (D.N.J. 2016) (citations and quotations omitted).

If the "court 'resolves the jurisdictional issue in the absence of an evidentiary hearing and

without the benefit of discovery, the plaintiff need only establish a _prima facie_ case of personal

jurisdiction.'"  _Back2Health Chiropractic Ctr., LLC_, 2021 WL 960875 at *3 (citation omitted).

In this event, the court also "take[s] the allegations of the complaint as true."  _Id._ (citation and

quotations omitted).  A _prima facie_ case is made out "by 'establishing with reasonable

particularity sufficient contacts between the defendant and the forum state.'"  _Mellon Bank (E.)_

_PSFS, Nat'l Ass'n v. Farino_, 960 F.2d 1217, 1223 (3d Cir. 1992) (citations omitted).  Once such

a showing is made, the burden shifts to the defendant to "present a compelling case that the

presence of some other considerations would render jurisdiction unreasonable." *Vectra Visual, Inc.*, 2021 WL 4520339 at *3 (citation omitted).

Applying this standard to the matter at hand, Defendant's motion to dismiss should be denied. As described in further detail below, Defendant has purposefully established sufficient minimum contacts with this jurisdiction, including, without limitation, aiming tortious behavior repeatedly to Redi-Data since 2016, for this Court to exercise specific jurisdiction over Defendant in this action. Alternatively, if the Court is unconvinced that specific jurisdiction is appropriate on the current record, which it respectfully should be, then the motion should be denied without prejudice pending the completion of limited jurisdictional discovery.

## II.  THIS COURT CAN AND SHOULD ASSERT PERSONAL JURISDICTION OVER DEFENDANT.

Under New Jersey law, the traditional two-step personal jurisdictional inquiry is "collapsed into one" question: "whether, under the Due Process Clause, the defendant has certain minimum contacts with [New Jersey] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Vectra Visual, Inc.*, 2021 WL 4520339 at *3 (citation omitted); *see also Miller Yatch Sales, Inc. v. Smith*, 384 F.3d 93, 96 (3d Cir. 2004) ("A federal court sitting in New Jersey has jurisdiction over parties to the extent provided under New Jersey state law. New Jersey's long-arm statute provides for jurisdiction coextensive with the due process requirements of the United States Constitution.") (citations omitted). Meaning, "parties who have constitutionally sufficient 'minimum contacts' with New Jersey are subject to suit there." *Miller*, 384 F.3d at 96 (citation omitted). "[P]urposefully established 'minimum' contacts" evidence that a defendant has "fair warning that its conduct will subject it to the jurisdiction of a federal court[]" and "should reasonably anticipate being hauled into court there." *Vectra Visual, Inc.*, 2021 WL 4520339 at *3 (citations omitted).

6

Personal jurisdiction over a nonresident defendant can be predicated on either general or specific jurisdiction. As recognized by this Court, "[i]f a defendant is subject to a forum's general jurisdiction, [it] can be sued there on any matter. If, however, a defendant is solely subject to specific jurisdiction, [it] may only face suit in the forum if its activities concerning the forum are related to the claims in the suit." *Id.* at *4 (citations omitted). Here, Redi-Data can make a *prima facie* showing that the Court can exercise specific jurisdiction over Defendant.[1]

A.   **The Court Can Exercise Specific Jurisdiction Over Defendant.**

Within the Third Circuit, the courts generally utilize a three-part test to ascertain whether an exercise of specific jurisdiction over a particular defendant is appropriate. *See O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 317 (3d Cir. 2007). Under this test, personal jurisdiction is proper where: (1) there is the existence of "purposeful availment": meaning, "the defendant must have purposefully directed [its] activities at the forum[;]" (2) "the litigation [] arise[s] out of or relate[s] to at least one of those activities[;]" and, assuming the first two requirements are met, (3) "the existence of jurisdiction otherwise comport[s] with fair play and substantial justice." *Id.* (citations and quotations omitted); *Adam Techs. LLC v. Well Shin Tech. Co., Ltd.*, No. 18-cv-10513, 2019 WL 3800236, at *3 (D.N.J. Aug. 13, 2019) (citations omitted). Each requirement of this traditional specific jurisdiction inquiry is satisfied here.

---

[1] Redi-Data is not conceding that general jurisdiction cannot be exercised over Defendant. It is possible that Defendant's contacts with New Jersey rise to a level that would render it subject to general jurisdiction in the State. However, Redi-Data does not have sufficient information to draw such a conclusion at this time, and does not believe it is necessary to do so because Defendant is subject to specific jurisdiction in New Jersey. If jurisdictional discovery were to proceed, Redi-Data reserves the right to allege Defendant's contacts with New Jersey also support general jurisdiction.

1.   **Defendant Purposefully Directed Activities To New Jersey.**

Defendant feigns ignorance about any sufficient minimum contacts with New Jersey,[2] but such ignorance is belied by the record.  As Redi-Data properly alleges in the Complaint, and as elaborated upon through the facts set forth in support of this motion, the Court can exercise specific jurisdiction over Defendant.

At the outset, Defendant's _physical location_ is irrelevant.  "[T]he personal jurisdiction jurisprudence is clear: 'physical presence in the forum is not a prerequisite to jurisdiction.'" _Christie v. Nat'l Inst. for Newman Studies_, 258 F. Supp. 3d 494, 503-04 (D.N.J. 2017) (citation omitted).  To the contrary, "even a single act can support jurisdiction[]" if that act "creates a 'substantial connection' with the forum."  _Manship v. Stein_, No. 21-cv-10389, 2022 WL 203247, at *5 (D.N.J. Jan. 24, 2022).  This is not a case in which Defendant exists in isolation in another country.  As Defendant admits, it "provides real time, actionable" information "to Internet networks, ISPs and other Internet users worldwide."  Linford Decl. at ¶ 5.  In fact, Defendant's "data is today used by the _majority of the Internet ISPs, email service providers, corporations_, universities, governments and military networks[]").[3]  Carbone Decl., Ex. A (copy of Defendant's "About Spamhaus" webpage) (emphasis added).  According to Defendant, "Spamhaus realtime threat and reputation blocklists currently protect over 3 Billion user mailboxes* and are responsible for blocking the vast majority of spam and malware sent out on

---

[2] In fact, Defendant largely, if not entirely, ignores the specific jurisdiction analysis in its motion and instead focusing solely on the _Calder_ Effects Test, which is described and addressed _infra_. _See_ Section II(B), _infra_.

[3] To the extent the Court has concerns about what companies and what ISPs utilize Defendant's services and operate in New Jersey, such an issue should be explored through jurisdictional discovery.

the Internet." *Id.* Logically, the foregoing includes businesses located or operating in New Jersey and New Jersey residents.

Furthermore, and contrary to Defendant's assertions, Defendant does not run a passive website. Defendant's website does not merely display information for those searching the Internet without a means for interaction with Defendant. To the contrary, Defendant's website is interactive: people or entities may contact Defendant through email or Twitter and it offers services to businesses operating in New Jersey, among others.[4] These interactive aspects militate in favor of a finding of personal jurisdiction. *See, e.g.*, *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1123-24 (W.D. Pa. 1997) (describing a sliding scale between Internet activity and personal jurisdiction).

Specifically, in addition to providing a vast array of information and recommendations, Defendant offers access to its DBL, SBL, and ROKSO through its website. Individuals and/or companies can also follow Defendant through Twitter. *See, e.g.*, Carbone Decl., Ex. A (copy of Defendant's "About Us" webpage). Defendant also offers, through authorized independent contractors,[5] a managed DNSBL Datafeed service for a fee, which service is typically "for users with professional DNSBL query requirements, such as corporate networks and ISPs[,]" and can be set up to "provide[] rapid data synchronizations between Spamhaus DNSBL servers and local servers on client networks." *See, e.g.*, Carbone Decl., Ex. B (copy of Defendant's "Spamhaus

---

[4] This can be inferred both by the admitted breadth of the audience Defendant caters to (*e.g.*, the self-described majority of ISPs, governments, network administrators) as well as the fact that ISPs Redi-Data contracted with for services in New Jersey clearly were using Defendant's blocklists and other services. *See generally* Buckley Decl.

[5] One of these alleged authorized independent contractors for "North America" is listed as Security Zones, which boasts clients including, without limitation, Yahoo!, AT&T, Columbia University, Virgin Media, LinkedIn, Aol., and Aflac, among others. *See* Carbone Decl., Exs. D-E.

9

DNSBL Datafeed" webpage).  The service "is supplied as a yearly subscription, with a Service

Level Agreement and Technical Support."  *Id.*  Specifically,

> The Datafeed service is supplied *as a yearly subscription*, with a Service
> Level Agreement and Technical Support.  *Pricing* is based on the total
> number of Email Users your organization provides email service for.  You
> can also try the service completely free for 30 days before agreeing to
> purchase it.
>
> [*Id.*]

Defendant even recommends and encourages ISPs to have an Acceptable Use Policy ("*AUP*")

and offers a tool through which an ISP can create one through its website.  *See* Carbone Decl.,

Ex. C (copy of Defendant's "ISP Area" webpage).  In addition, Defendant encourages such

policies to allow an ISP to "terminate a customer account upon receiving an SBL notification

from Spamhaus" and encourages checking IP addresses against its blocklists. Carbone Decl., Ex.

F at p. 2 (copy of Defendant's "How hosting providers can battle fraudulent sign-ups" webpage).

 Defendant also encourages, and provides tools and services for, hosting providers to

"check[]" new customer IP addresses prior to permitting a "new customer sign[]-up[.]"  *Id.* at p.

3.  On multiple locations in the website users can contact Defendant electronically.  *See* Carbone

Decl., Ex. D at pp. 6-7 (contact us querry).  Consequently, any claim that Defendant passively

provides information is belied by its own website.

 ISPs, email service providers, and corporations operating in New Jersey are using

Defendant's information and, upon information and belief, its services, as properly alleged in the

Complaint and evidenced by the Buckley Declaration.  *See, e.g*., Compl. at ¶ 9 (referring to

Defendant as directing and engaging in activities within New Jersey, among other things) & ¶¶

34-36 (referring to business interruptions caused by Defendant's listings); Buckley Decl. at ¶¶ 6-

21 (referring to ISPs operating in New Jersey that utilized Defendant's services); Carbone Decl.,

Ex. D (referring to a North American partner) & Ex. E (referring to clients of Defendant's North

American partner). As elaborated upon in the Buckley Declaration, several ISPs operating in New Jersey seemingly utilize Defendant's services and data, including, without limitation, Comcast, AT&T, IBM/Silverpop, Amazon, GoDaddy, and HostGator. Buckley Decl. at ¶¶ 6-21 & Exs. G, J, & K-N. For illustrative purposes, by way of an email sent on October 1, 2020, HostGator advised Redi-Data that it received – not located – a ROKSO report from Defendant and, based on same, permanently suspended Redi-Data's account.[6] Buckley Decl., Ex. M at p. 1. Amazon likewise appears to have received the report from Defendant. Buckley Decl., Ex. L at pp. 4-5.

At least one other court in the United States has exercised jurisdiction over Defendant on this basis. *See, e.g.*, *DatabaseUSA.com LLC v. The Spamhaus Project*, No. 19-cv-00423-JFB-CRZ, Order [Doc. No. 16] (D. Neb.).[7] Specifically, in a case strikingly similar to the one at hand, in an Order dated February 5, 2020, the Honorable Joseph F. Bataillon of the United States District Court for the District of Nebraska granted the plaintiff's motion for default judgment against Defendant. *Id.* In so doing, the *DatabaseUSA.com LLC* Court found that Defendant was subject to the jurisdiction of that court because "it appears that defendant knowingly engaged in activities in the State of Nebraska by selling internet services to providers who do business in Nebraska." *Id.* at p. 3. As the case here, the complaint in the District of Nebraska action alleged

---

[6] Logically, this may have been a result of Defendant's DNSBL Datafeed service, but jurisdictional discovery (if necessary) can confirm as much as well as the existence of other customers doing business in New Jersey and using Defendant's services and tools.

[7] For the Court's ease of reference, the Order from this action have been appended to the Carbone Declaration as **Exhibit "G."** In addition, Redi-Data has appended the affidavit proffered in that action in support of the motion for default judgment in which the plaintiff certifies that "Spamhaus lists are utilized by major companies and platforms in the United States, including Microsoft Outlook and ISPs throughout the country[]" as **Exhibit "H"** to the Carbone Declaration.

that jurisdiction was proper given Defendant's "impact on business and transactions occurring in the State of Nebraska[,]" and "specifically directed communications[.]"  *DatabaseUSA.com LLC v. The Spamhaus Project*, No. 19-cv-00423-JFB-CRZ, Compl. at ¶ 2 [Doc. No. 1].  Further evidence presented through an affidavit proffered in connection with a motion for default judgment further declared that Defendant's "lists are utilized by major companies and platforms in the United States, including Microsoft Outlook and ISPs throughout the country." *DatabaseUSA.com LLC v. The Spamhaus Project*, No. 19-cv-00423-JFB-CRZ, Affidavit [Doc. No. 14-1].  The same is true here – Defendant has (as described below) directed electronic communications to New Jersey and concededly offers services to the "majority" of ISPs, which (as this action demonstrates) affects business being transacted in New Jersey.  In addition, Defendant also unsuccessfully challenged personal jurisdiction in a case previously pending in the United States District Court for the Northern District of Illinois under the caption *e360 Insight et al. v. The Spamhaus Project*, No. 06-cv-3958-CPK (N.D. Ill.).

In addition to its interactive website and active business with ISPs, Defendant also actively investigates businesses, including, without, limitation, New Jersey businesses.  In Defendant's own words, Defendant is actively involved in *tracking* activities, Linford Decl. at ¶ 5, "maintains" its lists, *id.* at ¶ 7, and "*provid[es]* realtime actionable and highly accurate threat intelligence to the Internet's major networks, corporations, and security vendors[]" in addition to "*working with* law enforcement agencies to identify and pursue spam and malware sources worldwide."  *See* Carbone Decl., Ex. A (copy of Defendant's "About Spamhaus" webpage). Defendant's employees are even described as "*investigators*, forensic specialists, and network engineers[.]"  Linford Decl. at ¶ 6 (employees generally) & ¶ 11 (SBL-dedicated employees). More specifically, Defendant's DBL and SBL are "maintained" by specialists who both can add

or remove listings based on subjective considerations of undisclosed criteria set by Defendant. *See, e.g.*, Linford Decl. at ¶¶ 12-13 & ¶ 15; Carbone Decl., Ex. I at pp. 2-3 (copy of Defendant's DBL FAQ webpage referring to the team, responsibilities, and removal); *id.* at Ex. J at p. 1 (copy of Defendant's SBL FAQ webpage referring to "around the clock" maintenance). Similarly, "[t]he ROKSO database collates information and evidence on each spam operation to assist ISP Abuse Desks and Law Enforcement Agencies." *Id.* at Ex. K at pp. 1-2 (copy of Defendant's ROKSO FAQ webpage referring to maintenance and Defendant "constantly updating spammer profiles with information from many sources[]"). Accordingly, the maintenance of Defendant's blocklists and the subsequent determinations regarding the removal therefrom is an active process that involves investigation and the application of subjective criteria.

Defendant has certainly investigated Redi-Data, a New Jersey company, as reflected in its own records. As per the September 30, 2020 entry on the copy of the ROKSO received by HostGator,[8] Defendant engaged in a *"review of" Redi-Data's website*. Buckley Decl., Ex. M at p. 1. Redi-Data's website clearly reflects the location of its corporate headquarters and sales offices in New Jersey (and Pennsylvania). *See* Carbone Decl., Ex. L (copy of Redi-Data's "Contact Us" webpage). The May 6, 2020 entry on the ROKSO also evidences investigation, as does the April 5, 2016 entry. Buckley Decl., Ex. M at p. 2 (reference to *verifying* the nature of Redi-Data's business); *id.* (April 5, 2016 ROKSO entry claiming that Redi-Data "hired another company to spam for it[]").

Further militating in favor of specific jurisdiction in this case, Defendant engaged in electronic communications with companies located in or operating in New Jersey. Electronic

---

[8] At the risk of stating the obvious, Defendant's dissemination of its ROKSO also is a form of electronic communication.

communications are a factor this Court should consider in the minimum contacts analysis. *Parkway-Kew Corp. v. Harris Machine Tools, Inc*., No. 20-cv-6044, 2020 WL 6375790, at *4 (D.N.J. Oct. 30, 2020) ("Communications between parties over mail, telephone, and e-mail, however, factor into a court's minimum contacts analysis.") (citations omitted); *Miller Yacht Sales, Inc*., 384 F.3d at 100 (citing *Grand Entm't Grp., Ltd. v. Star Media Sales, Inc*., 988 F.2d 476, 482 (3d Cir. 1993)).  Electronic communications are particularly noteworthy where, as here, the emails indicate where the recipient was located, which assists in demonstrating purposeful direction.  *See, e.g.*, *Am. Bd. of Internal Med. v. Rushford*, No. 14-cv-6428, 2015 WL 5164791, at *5 (D.N.J. Sept. 2, 2015).

        As alleged in the Complaint and elaborated upon in the Buckley Declaration, Defendant has been communicating with Redi-Data and ISPs doing business in New Jersey throughout the years.  *See, e.g.*, Buckley Decl. at ¶¶ 6-21; Compl. at ¶¶ 37-39 (referring to removal requests and demand letter).  Defendant has communicated both directly with Redi-Data, *see* Buckley Decl. at ¶ 12 & Ex. E, as well as indirectly with Redi-Data and with ISPs concerning Redi-Data.  *See, e.g.*, *id.* at ¶ 14 & Ex. G (referencing communications between IBM/Silverpop and Defendant); *id.* at ¶ 16 & Ex. J (referencing communications between Odyssey and Defendant); *id.* at ¶ 17 & Exs. K-L (referencing communications between Amazon and Defendant).  As far back as May 4, 2016, Defendant received email communications from Redi-Data clearly referring to its New Jersey location within the message.  *See, e.g.*, Buckley Decl., Ex. A at p. 4 (signature block setting forth Redi-Data's Fairfield, New Jersey address).  Similarly, and contrary to Defendant's assertion that the demand letter "did not mention New Jersey," Memorandum of Law in Support of Defendant's Motion to Dismiss the Complaint ("*Def.'s Br.*"), p. 17, the demand letter invited

Defendant to contact Redi-Data's attorneys (*e.g.*, its agents), whose *New Jersey's address* is listed on the top of the first page.  Buckley Decl., Ex. H at p. 1.

These communications, along with the services offered and investigations launched by Defendant, are sufficient for this Court to find that Defendant has the necessary minimum contacts with New Jersey for this Court to constitutionally exercise jurisdiction over Defendant. As recognized by this Judicial District, "[a]ll that is required to meet [the purposeful availment] standard is at least a single deliberate contact with the forum state that relates to the cause of action." *Am. Bd. of Internal Medicine*, 2015 WL 5164791 at *4 (citation and quotations omitted).  Accordingly, the first requirement of any specific jurisdiction analysis is satisfied.

## 2.     This Litigation "Arises Out Of" The Foregoing Activities.

With respect to the second requirement—to wit, the "arise out of or relate" requirement—this inquiry is fact-sensitive and requires something "closer and more direct causal connection than that provided by the but-for test." *Parkway-Key Corp.*, 2020 WL 6375790 at *5 (citation omitted).  The courts have, however, recognized that "there is no specific rule susceptible to mechanical application[.]" *Id.* (citation omitted).

This action indisputably "arises from and relates to" the foregoing contacts with New Jersey.  Indeed, as set forth in the Complaint and elaborated upon in the Buckley Declaration, this case arises out of the services that Defendant offers to businesses and ISPs through its interactive website, its blocklist listings, and alleged investigations it conducted, which falsely identified Redi-Data as a "spammer," and electronic communications referring to Redi-Data as a spammer and/or giving the impression of same.  *See generally* Compl.  Redi-Data is not a spammer and does not engage in any nefarious activity that should get it listed on Defendant's

DBL, SBL, or ROKSO.[9]  *See* Buckley Decl. at ¶¶ 2-5; Compl. at ¶¶ 12-21.  As such, Redi-Data's

claims are inextricably linked to Defendant's contact with this State and, as such, the second

requirement of any specific jurisdiction analysis is satisfied.

### 3. The Notions Of Fair Play And Substantial Justice Clearly Weigh In Favor Of This Court's Exercise Of Personal Jurisdiction Over Defendant.

The third and final requirement of the specific jurisdiction analysis—fairness—also

supports the exercise of personal jurisdiction in this matter.  In order to "defeat jurisdiction based

on this fairness inquiry, a defendant must 'present a compelling case that the presence of some

other considerations would render jurisdiction unreasonable.'"  *Miller Yacht Sales, Inc*, 384 F.3d

at 97 (citation omitted); *Christie*, 258 F. Supp. 3d at 507 (describing cases in which a defendant

can defeat personal jurisdiction on fairness grounds as rare).  Indeed, "[b]ecause Defendants have

minimum contacts with New Jersey and the Plaintiffs' claim arises out and relates to those

contacts, the exercise of personal jurisdiction is presumptively reasonable."  *Manship*, 2022 WL

203247 at *8 (setting forth factors to consider regarding fairness).

Requiring Defendant to defend itself in this jurisdiction in connection with this action will

not offend any notion of fair play or substantial justice.  At the outset, "[t]here is no general policy

or special consideration providing any type of deference for nonprofits that commit tortious

behavior from avoiding being hauled to court."  *Christie*, 258 F. Supp. 3d at 508 (collecting cases).

Moreover, "New Jersey maintains a significant policy interest in protecting [ ] residents of its state

---

[9] To be clear, the mere placement on the DBL and SBL is not, as Defendant suggests, the sum total of the conduct alleged in the Complaint.  *Contra* Def.'s Br. at p. 17.  To the contrary, Redi-Data alleges that it repeatedly reached out to Defendant to explain, directly and through an intermediary, the nature of its business and Defendant's error, yet Defendant refused to explain, reconsider, or stop its listings pertaining to Redi-Data on blocklists.  Compl. at ¶¶ 31-46; Buckley Decl. at ¶¶ 6-21.

against [tortious conduct]." *Id.* at 509 (collecting cases) (citations and quotations omitted).  In addition, Redi-Data has an interest in obtaining convenient and efficient relief.  If this Court were to decline jurisdiction, Redi-Data may very well be without any efficient, convenient, or even reasonable venue to defend its rights and prosecute its meritorious claims against Defendant.  It is highly unlikely that Redi-Data would be able to commence a civil lawsuit against Defendant in Andorra.  Further, while perhaps some evidence and witnesses would be located in Andorra, given the rise and use of virtual technology to prosecute and defend cases in the last two years, the location of witnesses and documents would not weigh heavily (if at all) against this Court's exercise of jurisdiction in this case.  *See, e.g.*, *Green v. William Mason & Co.*, 996 F. Supp. 394, 396 (D.N.J. 1998) ("Geography is not the touchstone of fairness. In an age when business is routinely conducted by electronic technology, and air travel brings the two national coasts within hours of each other, state boundaries are less relevant to the determination of fairness.").  Defendant has also been sued in the United States twice before.

In short, there is no compelling reason for this Court to disregard Plaintiff's choice of forum, which is its state of incorporation and the location of its principal place of business, on fairness grounds.  Accordingly, the exercise of specific jurisdiction here is both constitutional and fundamentally fair under the circumstances.

### B.    The *Calder* Effects Test Applies Here.

Notwithstanding the foregoing, even were the Court to find that the traditional exercise of specific jurisdiction is not proper, jurisdiction would be pursuant to the "*Calder* Effects Test," which Defendant concedes would apply here.  *See* Def.'s Br. at p. 15.  Indeed, the fact that Defendant's tortious activity occurred via the Internet does not affect whether the Calder Effects Test is applicable.  *See, e.g.*, *Christie*, 258 F. Supp. 3d at 500 ("[W]hether tortious conduct is

17

committed via the Internet or in more traditional means, does not change the inquiry of the location where Defendants purposefully aimed their alleged cyberactivity.") (citations omitted).

It is well-settled that in cases involving intentional torts, such as here, the *Calder* Effects Test is implicated. *MaxLite, Inc.*, 193 F. Supp. 3d at 384 (citing *Calder v. Jones*, 465 U.S. 783 (1984)).  As recognized by this Court, "[t]he *Calder* Effects Test 'can demonstrate a court's jurisdiction over a defendant even when the defendant's contacts with the forum alone [] are far too small to comport with the requirements of due process under our traditional analysis." *Id.* (citation omitted).  Stated another way, "[u]nder *Calder*, 'an intentional tort directed at plaintiff and having sufficient impact upon [the plaintiff] in the forum may suffice to enhance otherwise insufficient contacts with the forum such that the minimum contacts prong of the Due Process test is satisfied." *Id.* (citation and quotations omitted).  The courts of the "Third Circuit construe[] the *Calder* Effects Test to require that: (1) that the defendant committed an intentional tort; (2) that the plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; and (3) that the defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity." *Strategic Prod. & Serv., LLC v. Integrated Media Tech., Inc.*, No. 18-cv-00694, 2019 WL 2067551, at *6 (D.N.J. May 10, 2019) (citation omitted).  Such requirements are met here.

First, Redi-Data alleges in the Complaint that Defendant committed intentional torts – *e.g.*, tortious interference and defamation – which satisfies the first prong of this analysis.  *See* Compl. at ¶¶ 65-90; *see also* Buckley Decl. at ¶¶ 6-21; Def.'s Br. at p. 17 (conceding that Redi-Data alleges in the Complaint that Defendant has "erroneously plac[ed] Redi-Data's IPs and domains on its DNSBLs[]").  Distilled to its essence, and as alleged in the Complaint, Defendant

has defamed and tortiously interfered with Redi-Data's business, prospective business, and contracts by routinely and improperly listing its domain names and IP addresses on its blocklists and refusing to engage in any meaningful discussions about its justifications for doing so or promptly removing Redi-Data's domain names and IP addresses.  Compl. at ¶¶ 31-79; Buckley Decl. at ¶¶ 6-21 (further elaborating on the allegations of the Complaint as they pertain to personal jurisdiction).  These actions, which have also formed the basis of the prior lawsuits in Nebraska and Illinois, have been entirely disruptive to Redi-Data's business and resulted in the loss of customers, the termination of service contracts, and lost business.  Compl. at ¶¶ 62-64, 71-72, 77-79, & 89; Buckley Decl. at ¶¶ 5, 9-10, 13, 15, 17, & 19-20.  While the merits of these claims will be further borne out through discovery, it is indisputable that Defendant is alleged to have committed intentional torts.  *See, e.g.*, *MaxLite, Inc.*, 193 F. Supp. 3d at 388 (tortious interference with contract claim was "an intentional tort sufficient to satisfy the first prong of *Calder*[]") (citation omitted); *Calder*, 465 U.S. at 788-91 (involving a defamation claim).

Furthermore, the harm Redi-Data suffered as a result of Defendant's action was felt in New Jersey, Redi-Data's principal place of business and state of incorporation.  Compl. at ¶ 6; Carbone Decl., Ex. L at p. 1.  It is well-settled that the harm suffered by a company as a result of Defendant's defamation and tortious interference is felt in the forum of company's principle place of business.  *See, e.g.*, *MaxLite, Inc.*, 193 F. Supp. 3d at 388 (with respect to tortious interference with contract, "the brunt of the harm caused by the alleged intentional tort must necessarily have been felt by [the plaintiff] in [the forum], as [the plaintiff's] business practice is based in [the forum][]") (citation omitted); *Oticon, Inc. v. Sebotek Hearing Sys., LLC*, 865 F. Supp. 2d 501, 518-19 (D.N.J. 2011) ("The Court also finds that Plaintiff has established the second prong of the *Calder* test, that the focal point of the harm was felt in New Jersey.  Plaintiff

19

has its principle place of business in New Jersey, and Plaintiff alleges that the alleged tortious conduct impacted and harmed its business."); *Calder*, 465 U.S. at 790 (brunt of injury resulting from a defamatory article felt where the plaintiff lived and worked).  This cannot be legitimately disputed.

That said, in cases involving torts committed via the Internet, the focus of the second and third prongs of the *Calder* Effects Test (which subjects are the bulk of Defendant's opposition) "should focus on where a defendant intended to direct its tortious conduct and whether that defendant knew, or should have known, its activities would be felt in that forum state." *Christie*, 258 F. Supp. 3d at 503.  Here, Defendant posits that the *Calder* Effects Test cannot be satisfied because: (1) Defendant was never aware of where Redi-Data was located and (2) even if Defendant was aware of this fact, the alleged conduct was neither directed nor targeted at New Jersey.  Def.'s Br. at p. 17.  Neither argument withstands scrutiny.

As a threshold matter, contrary to Defendant's argument, Defendant was aware of Redi-Data's location as early as May 2016—*Redi-Data's corporate headquarters location is listed in its signature blocks*.  *See, e.g.*, Buckley Decl., Ex. A at p. 4 (signature block reflecting New Jersey address).  Over the years, Defendant actively communicated with Redi-Data through removal requests as well as indirectly through ISPs operating in New Jersey.  *See* Section II(A), *supra*.  Moreover, Defendant actively investigated and analyzed Redi-Data's business and website, on which Redi-Data's address is also prominently displayed.  *See, e.g.*, Buckley Decl., Ex. M at p. 1 (displaying a Sept. 30, 2020 ROKSO entry that indicated Redi-Data's website had been reviewed and a May 2020 entry indicating Defendant "verif[ied]" Redi-Data's business); Carbone Decl., Ex. L at p. 1.  If that were not sufficient, which it is, Redi-Data's counsel's address (a New Jersey location) was clearly displayed in the demand letter.  Buckley Decl., Ex.

20

H at p. 1 (demand letter).  In short, Defendant's claim of ignorance as to Redi-Data's location is unpersuasive.[10]

Defendant was also aware that its improper actions were harming Redi-Data.  On no less than two occasions Redi-Data expressed to Defendant that its actions were causing harm to its business.  First, Redi-Data sent a demand letter on June 19, 2018 that noted Redi-Data's business operations were being "negatively impacted."  Buckley Decl., Ex. H at p. 2.  That demand letter was ignored.  Two years later, in communications to Defendant indirectly through Amazon, Redi-Data again advised that Defendant's actions were "potentially adversely affect[ing] Redi-Data financially[.]"  Buckley Decl., Ex. L at p. 2.  This notice was also ignored.

Finally, the record supports a finding that Defendant intended to direct (*e.g.*, expressly aimed) its tortious conduct to Redi-Data and New Jersey.  As far back as May 2016 (and while Defendant knew or should have known of Redi-Data's location), Redi-Data has been disputing Defendant's criteria and inclusion of its domain names and IP addresses on Defendant's blocklists.  However, Defendant has repeatedly and continually refused to stop improperly listing Redi-Data's domain names and IP addresses, rejected requests to be removed from those blocklists even after tracking Redi-Data's IP addresses and "verifying" its business "by [checking [Redi-Data's] website."  Buckley Decl., Ex. M (ROKSO list entries).  Defendant even refuses to explain its justification (*e.g.*, its "criteria") for including Redi-Data on its blocklists.  In fact, Defendant merely appears to have suggested at points that Redi-Data "wait it out."  *See*

---

[10] Even if Defendant could plausibly claim ignorance as to where Redi-Data would feel any harm, Defendant's "claim of ignorance cannot defeat personal jurisdiction."  *Christie*, 258 F. Supp. 3d at 505 (noting in cases involving Internet torts under the CFA that courts "have reasoned that if an Internet tortfeasor claims ignorance of where his tortious conduct will be felt, but knows his conduct will result in an injury, his claim of ignorance cannot defeat personal jurisdiction.").

Buckley Decl., Ex. E (refusing to disclose the criteria for inclusion on the DBL and stating that "DBL listings expire over time, so if our systems do not see your domain for a while it will drop out of the DBL zone."); *id.* at Ex. A at p. 1 ("[I]t is apparent that [Redi-Data] do[es] not view your business as spam.  That puts us in a fundamental disagreement.  I don't see a way around this.").

Perhaps the clearest example of deliberate targeting, however, is Defendant's disregard of the June 19, 2018 demand letter from New Jersey counsel.  *See* Buckley Decl., Ex. H.  In fact, the demand letter was not only ignored, Defendant thereafter continued to place Redi-Data's domain names and IP addresses on its blocklists.  *See, e.g.*, Buckley Decl. at ¶¶ 16-21; Compl. at ¶¶ 43-47.  In light of the foregoing, Defendant should have known that its conduct would be felt in New Jersey, which satisfies the third prong of the *Calder* Effects Test in cases involving the Internet contrary to Defendant's argument.  *Christie*, 258 F. Supp. 3d at 505 ("In this case, based on the alleged facts, Defendants actively communicated with Plaintiff in New Jersey, and affirmatively directed tortious conduct via the Internet at Plaintiff who they knew was located in New Jersey at that time. Thus, I find that Defendants expressly aimed tortious conduct at Plaintiff in New Jersey and knew that Plaintiff would feel the brunt of the harm in New Jersey.").

At bottom, "because Defendant[] deliberately targeted a New Jersey resident—who Defendant[] knew was in New Jersey when [it] targeted [the company]—with tortious conduct, Defendant[] should have reasonably anticipated being hauled to court in New Jersey."  *Id.* at 506.  To the extent there are any disputed issues of fact with respect to the foregoing, those disputes must be resolved in favor of Redi-Data in the absence of jurisdictional discovery and an evidentiary hearing.  *See* Section I, *supra*.  Consequently, specific jurisdiction can be constitutionally exercised by this Court over Defendant under the *Calder* Effects Test.

### III.   ALTERNATIVELY, JURISDICTIONAL DISCOVERY IS APPROPRIATE.

To the extent the Court has any lingering doubt concerning its ability to assert personal jurisdiction over Defendant, which it should not, or if there exist any factual issues that cannot be resolved in favor of Redi-Data, the Court should provide an opportunity for jurisdictional discovery.  It is well-settled that "[a] court should 'ordinarily allow [limited jurisdictional discovery] when a plaintiff's claim to personal jurisdiction is not clearly frivolous.'"  *N.J. D.E.P. v. E.I. du Pont de Nemours & Co.*, Nos. 19-cv-14758, 19-cv-14765, 19-cv-14766, & 19-cv-14767, 2021 WL 6064842, at *7 (D.N.J. Dec. 20, 2021) (citation omitted) (alterations in original).  Indeed, "[i]f a plaintiff presents factual allegations that suggest 'with reasonable particularity' the possible existence of the requisite 'contacts between [the party] and the forum state,'" the plaintiff is entitled to conduct jurisdictional discovery before the court dismisses for lack of personal jurisdiction.  *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003) (citations omitted).

Redi-Data's allegations certainly suggest, with reasonable particularity, that Defendant has sufficient contacts with New Jersey such that an exercise of jurisdiction over Defendant would be both constitutional and fundamentally fair.  *See* Section II, *supra*.  It is likely that further evidence of these contacts exists.  This further evidence includes things like: (i) the existence of companies operating or located in New Jersey that pay for Defendant's DNSBL Datafeed or otherwise use/used Defendant's services (*e.g.*, its AUP creation tool); (ii) the exact manner and nature of any removal investigations conducted by Defendant; (iii) internal response to Redi-Data's June 19, 2018 demand letter; (iv) any records reflecting other New Jersey companies that access the DBL, SBL, and/or receives the ROKSO list regardless of payment for services (*e.g.*, any individuals or entities using Defendant's "free trial" for the DNSBL

Datafeed); and (v) other authorized representatives operating in New Jersey.  These facts would have jurisdictional significance and thus their existence militates in favor of jurisdictional discovery.

## **CONCLUSION**

For all the foregoing reasons, Defendant's motion to dismiss should be denied. Alternatively, if the Court is unconvinced, the motion should be denied without prejudice pending the completion of jurisdictional discovery.

Respectfully submitted,

**COLE SCHOTZ P.C.**
*Attorneys for Redi-Data Inc.*

By:___*/s/ Elizabeth A. Carbone*_____
Jason R. Melzer
Elizabeth A. Carbone

**DATED:**  January 31, 2021

24

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and complete copy of the foregoing document has been served on January 31, 2022, via CM/ECF to all counsel of record.

By:   <u>*/s/ Elizabeth A. Carbone*</u>
        *Attorneys for Plaintiff, Redi-Data, Inc.*

25