<u>Not for Publication</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| REDI-DATA, INC., <br>     *Plaintiff*, <br> v. <br> THE SPAMHAUS PROJECT a/k/a <br> THE SPAMHAUS PROJECT LTD., <br>     *Defendant*. | Case No. 20-cv-17484 <br><br> <u>OPINION</u> |

**<u>John Michael Vazquez, U.S.D.J.</u>**

This action arises out of Plaintiff's allegations that Defendant, a foreign nonprofit organization, defamed Plaintiff and tortiously interfered with its business. Currently pending before the Court is Defendant's motion to dismiss for lack of personal jurisdiction. D.E. 15. The Court reviewed the parties' submissions[1] in support and in opposition and decided the motion without oral argument, pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons that follow, Defendant's motion is denied without prejudice so that the parties may conduct limited jurisdictional discovery.

**I.    BACKGROUND**

Plaintiff, Redi-Data, Inc. ("Redi-Data"), is a New Jersey corporation with its principal place of business in New Jersey. D.E. 1 ("Compl.") ¶ 6. Redi-Data is a list broker providing direct mail and email marketing services to health-science industry clients in the United States. *Id.* ¶¶ 12-17. To conduct its business, Redi-Data routes its clients' marketing communications through

---

[1] Defendant's brief in support of its motion to dismiss, D.E. 15-1, will be referred to as "Br."; Plaintiff's brief opposing the motion, D.E. 22, will be referred to as "Opp."; and Defendant's reply brief in further support of its motion, D.E. 23, will be referred to as "Reply."

two internet domain names, "redimail.com" and "redidata.com," and their associated internet protocol ("IP") addresses. *Id.* ¶¶ 13, 16. These domains and IP addresses are serviced by various internet service providers ("ISPs"). *See* D.E. 22-14 ("Buckley Decl.") at 5 n.1. Redi-Data maintains full compliance with all federal and state laws, including the CAN-SPAM Act, 15 U.S.C. §§ 7701-13,[2] in electronically distributing its commercial marketing communications. Compl. ¶¶ 18-20.

Defendant The Spamhaus Project ("Spamhaus") is a not-for-profit limited liability company. D.E. 15-2 ("Linford Decl.") ¶ 4. Spamhaus tracks spam and related cyberthreats such as phishing, malware, and botnets. Compl. ¶ 22. Spamhaus provides cybersecurity data to "the majority of the Internet's ISPs, email service providers, corporations, universities, governments[,] and military networks." D.E. 22-2 ("Carbone Decl.") Ex. A at 1. Spamhaus is presently headquartered in and incorporated under the laws of the Principality of Andorra. Linford Decl. ¶ 4. Prior to 2019, Spamhaus was headquartered in and organized as the same under the laws of the United Kingdom. *Id.* ¶¶ 3-4.

Spamhaus maintains blocklists, which are used by internet service and hosting services providers to prevent Spamhaus users from receiving certain emails. Compl. ¶ 23. When Spamhaus detects that an entity has distributed unsolicited bulk email ("spam"), it places the corresponding domains and IP addresses on its blocklists, either automatically or manually by one its researchers. *Id.* ¶¶ 25-28. This occurs regardless of the email's legality or compliance with the CAN-SPAM

---

[2] The CAN-SPAM Act governs the transmission of all commercial email and generally prohibits the transmission of false or deceptive messages. *See generally CAN-SPAM Act: A Compliance Guide for Business*, FED. TRADE COMM'N (Jan. 2022), https://www.ftc.gov/business-guidance/resources/can-spam-act-compliance-guide-business. The Act also requires commercial emails to contain certain disclosures. *Id.* For example, messages must include the sender's physical postal address and explain how the recipient may opt out of receiving future messages. *Id.*

Act. Linford Decl. ¶ 9. Removal from the blocklists may be pursued and obtained through procedures established by Spamhaus. *Id.* ¶ 15.

The blocklists, as well as all Spamhaus data, are hosted on Spamhaus servers and may be accessed from the Spamhaus webpage. *Id.* ¶¶ 7-8. These resources are available, free of charge, to all internet users who wish to use them. *Id.* ¶ 8. In fact, Spamhaus provides no commercial goods or services whatsoever, not even to ISPs or other entity users. D.E. 23-12 ("Marin Decl.") ¶¶ 5-8. Spamhaus does, however, maintain a "strategic partner," Spamhaus Technology LTD ("Spamhaus Technology"). *Id.* ¶ 9. Spamhaus Technology and Spamhaus are legally separate entities: they share no income, governing authority, or power to bind or obligate each other contractually. *Id.* ¶¶ 9-12. Spamhaus Technology, unlike Spamhaus, offers commercial services. *Id.* ¶ 9. Among them is a fee-based, managed blocklist "datafeed" service, which is offered in North America through Spamhaus Technology's independent contractor, Security Zones. *Id.* ¶¶ 9-13.

In April 2016, Spamhaus added Redi-Data's IP addresses to its blocklists; in April 2018, Spamhaus added Redi-Data's domain names as well. Compl. ¶¶ 3-4. Redi-Data maintains that these additions were either intentionally or recklessly erroneous and substantially harmed its business operations. *Id.* ¶¶ 31-36. Specifically, Redi-Data alleges that it has suffered "lost good will, a tarnished reputation, lost opportunities, lost customers, and lost profits," among other injuries. *Id.* ¶¶ 5, 33-34. Upon Redi-Data's request, Spamhaus removed the domain names from the blocklists in June 2018. *Id.* ¶¶ 37-38. Later that same month, Spamhaus reinstated Redi-Data's domain names to its blocklists. *Id.* ¶ 39. Thereafter, Redi-Data repeatedly requested removal and served a letter on Spamhaus demanding the same. *Id.* ¶¶ 40-42; Ex. A. Redi-Data did not receive an "adequate response" to this letter, and Spamhaus has not removed Redi-Data's domains or IP

addresses from its blocklists. *Id.* ¶¶ 43-44. Moreover, Redi-Data alleges that Spamhaus has expressly refused to remove Redi-Data's domain names from the blocklists. *Id.* ¶¶ 44, 48, 59. Redi-Data asserts that the sum of these harms warrants the award of injunctive and monetary relief. *Id.* ¶ 53.

Redi-Data filed its Complaint on November 30, 2020, asserting the following four counts: (1) preliminary and permanent injunctive relief; (2) interference with prospective economic advantages and/or business relations; (3) tortious interference with contractual relationships; and (4) defamation. D.E. 1. Spamhaus' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2) followed. D.E. 15.

## II.   STANDARD OF REVIEW

Rule 12(b)(2) permits a party to move to dismiss a case for lack of personal jurisdiction. In such a motion, the plaintiff bears the burden of demonstrating "sufficient facts to establish that jurisdiction is proper." *Mellon Bank PSFS Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992). In reviewing a motion to dismiss for lack of personal jurisdiction, a court "must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff." *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 142 n.1 (3d Cir. 1992). But when a defendant raises a jurisdictional defense, "a plaintiff bears the burden of proving by affidavits or other competent evidence that jurisdiction is proper." *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1302 (3d Cir. 1996).

Thus, to withstand a Rule 12(b)(2) motion, a plaintiff may not rely on the pleadings alone, as it "is inherently a matter which requires resolution of factual issues outside the pleadings." *Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 66 n.9 (3d Cir. 1984). In conducting this jurisdictional analysis, district courts may rely upon the parties' declarations for relevant factual

support. *See, e.g.*, *Shnayderman v. Cell-U-More, Inc.*, Civ. No. 18-5103, 2018 WL 6069167, at *11 (D.N.J. Nov. 20, 2018) (using information from the plaintiff's complaint and declaration to determine that the defendant did not travel to the forum state or solicit a loan from the plaintiff in the forum state); *Pausch LLC v. Ti-Ba Enters.*, Civ. No. 13-6933, 2014 WL 5092649, at *6-7 (D.N.J. Oct. 8, 2014) (using declarations from both parties to conclude that contacts with the forum were insufficient for personal jurisdiction). Therefore, in determining whether personal jurisdiction exists, the Court looks beyond the pleadings to all relevant evidence and construes all disputed facts in favor of the plaintiff.

### III. ANALYSIS

"[A] federal district court may assert personal jurisdiction over a nonresident of the state in which the court sits to the extent authorized by the law of that state" so long as the jurisdiction comports with the Due Process Clause of the Fourteenth Amendment. *Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007) (internal quotation marks omitted). The inquiry thus involves a two-step process: first looking to the state requirements and then to the constitutional requirements. *IMO Indus., Inc. v. Kiekart AG*, 155 F.3d 254, 259 (3d Cir. 1998). New Jersey's long-arm jurisdiction law provides that courts may "exercise jurisdiction over a non-resident defendant to the uttermost limits permitted by the United States Constitution." *Nicastro v. McIntyre Mach. Am., Ltd.*, 201 N.J. 48, 72 (2010) (internal quotation marks omitted), *rev'd on other grounds sub nom.*, *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873 (2011). Accordingly, the two steps are collapsed into one and a court "ask[s] whether, under the Due Process Clause, the defendant has certain minimum contacts with [New Jersey] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007) (internal quotation marks omitted). In other words, to establish

personal jurisdiction, the Due Process Clause requires (1) minimum contacts between the defendant and the forum; and (2) that jurisdiction over the defendant comports with "'fair play and substantial justice.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945)).

The "constitutional touchstone remains whether the defendant purposefully established 'minimum' contacts in the forum State." *Id.* at 474 (citing *Int'l Shoe Co.*, 326 U.S. at 316). A defendant must have "fair warning" that its conduct will subject it to the jurisdiction of a foreign court. *Id.* at 472. A defendant's conduct and connection with the forum state must be such that the defendant should reasonably anticipate being haled into court there. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Mere foreseeability that the defendant's conduct may cause injury in a forum state is not enough to satisfy the Due Process Clause in this respect. *Burger King*, 471 U.S. at 474.

Once a plaintiff presents a *prima facie* case of personal jurisdiction by establishing minimum contacts, the burden shifts to the defendant. *Carteret Sav. Bank*, 954 F.2d at 150 (citing *Burger King*, 471 U.S. at 477). When sufficient minimum contacts have been established, jurisdiction is "presumptively constitutional." *O'Connor*, 496 F.3d at 324. In turn, a defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477.

Personal jurisdiction may be established by means of general jurisdiction or specific jurisdiction over a defendant.[3] *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915,

---

[3] Personal jurisdiction may also be exercised on other grounds, including consent, waiver, and in-state service on an individual defendant. *See Jasper v. Bexar Cty. Adult Det. Ctr.*, 332 F. App'x. 718, 719 (3d Cir. 1999) (regarding consent); *In re Asbestos Prods. Liab. Litig. (No. VI)*, 921 F.3d 98, 104-05 (3d Cir. 2019) (regarding waiver); *Burnham v. Superior Ct. of Cal.*, 495 U.S. 604, 628

919 (2011). If a defendant is subject to a forum's general jurisdiction, it can be sued there on any matter. *Id*. If, however, a defendant is solely subject to specific jurisdiction, it may only face suit in the forum if its activities concerning the forum are related to the claims in the suit. *Id*.

### A. General Personal Jurisdiction

"To achieve general jurisdiction over an individual or corporation, affiliations with the forum state must be 'so continuous and systematic as to render them essentially at home in the forum State.'" *Koch v. Pechota*, 744 F. App'x 105, 110 (3d Cir. 2018) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014)). A corporation's place of incorporation and principal place of business are the quintessential forums for exercising general jurisdiction. *Daimler*, 571 U.S. at 118 (citing *Goodyear*, 564 U.S. at 919). If "a defendant's contacts 'plainly [do] not approach' the quantity required for general jurisdiction, [the] Court need not inquire as to the other means by which a defendant can satisfy general jurisdiction." *Allaham v. Naddaf*, 635 F. App'x 32, 38 (3d Cir. 2015) (first alteration in original) (quoting *Daimler*, 571 U.S. at 139 n.19).

Here, the Court cannot exercise general personal jurisdiction over Spamhaus. Spamhaus is incorporated in the Principality of Andorra and also maintains its principal place of business there. Linford Decl. ¶ 4. Prior to 2019, Spamhaus was incorporated under the laws of, and maintained its principal place of business in, the United Kingdom. *Id.* ¶ 3. Redi-Data presents no information supporting a finding of general jurisdiction. *See* Opp. at 7 n.1. Because Redi-Data has not demonstrated that Spamhaus' contacts with New Jersey are "so continuous and systematic" as to render Spamhaus essentially at home in the state, the Court finds that Spamhaus is not subject to general personal jurisdiction. *Daimler*, 571 U.S. at 127.

---

(1990) (regarding in-state service); *see also Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 590-97 (1991) (regarding consent via a forum selection clause).

### B. Specific Personal Jurisdiction

Specific jurisdiction may be exercised if the defendant "purposefully directed [its] activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King*, 471 U.S. at 472 (internal citations and quotation marks omitted). The minimum contacts analysis depends upon "the relationship among the defendant, the forum, and the litigation." *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977). However, actual "[p]hysical presence within the forum is not required to establish personal jurisdiction over a nonresident defendant." *IMO Indus., Inc.*, 155 F.3d at 259.

The Third Circuit has laid out a three-part test to determine whether specific jurisdiction exists as to a particular defendant. *O'Connor*, 496 F.3d at 317. First, the defendant must have "purposefully directed [its] activities at the forum." *Id.* (internal quotation marks omitted). This factor has also been characterized as "purposeful availment," and focuses on contacts that the defendant itself generated within the forum state. *Burger King*, 471 U.S. at 475. The "purposefully directed" or "purposeful availment" requirement is designed to prevent a defendant from being haled into a forum "solely as the result of random, fortuitous, or attenuated contacts," or due to the "unilateral activity of another party or third person." *Id.* (internal quotation marks omitted) (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984); *World-Wide Volkswagen*, 44 U.S. at 299; *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984)).

Second, the litigation must "arise out of or relate to at least one of those activities." *O'Connor*, 496 F.3d at 317 (internal quotation marks omitted). This has been described as the "relatedness" element. To establish causation, the "causal connection can be somewhat looser than the tort concept of proximate causation, but it must nonetheless be intimate enough to keep the *quid pro quo* proportional and personal jurisdiction reasonably foreseeable." *Id.* at 323

(citation omitted). The relatedness requirement is a "necessarily fact-sensitive" inquiry designed to "keep the jurisdictional exposure that results from a contact closely tailored to that contact's accompanying substantive obligations." *Id; see also Ford Motor Co. v. Montana Eighth Judicial District Court*, - U.S. -, 141 S. Ct. 1017, 1026-28 (2021) (analyzing the "relate to" prong).

Third, if the first two requirements are met, the exercise of jurisdiction must "otherwise comport with fair play and substantial justice." *Id.* at 317 (internal quotation marks omitted). To overcome the presumption of constitutionality, "the defendant must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* at 324 (internal quotation marks omitted).

A specific jurisdiction analysis is claim-specific. *Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001). Thus, variations of the *O'Connor* test may apply depending on the nature of the action and its factual circumstances. For instance, as in the present case, when jurisdictional contacts are allegedly based upon Internet activity, courts have used different approaches for analyzing the "purposeful availment" requirement. *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 451-52 (3d Cir. 2003). Foremost among them is the "sliding scale" approach, pursuant to which "the propriety of exercising jurisdiction depends on where on a sliding scale of commercial interactivity the web site falls." *Id.* at 452 (citing *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997)). Consistent with the traditional purposeful ailment analysis, this approach to analyzing personal jurisdiction based on internet activity requires that the defendant intentionally directed its activity towards the forum state. *Id.* at 452. Accordingly, the Third Circuit has required "something more," beyond the maintenance of a globally accessible commercial website, to evidence purposeful availment of the forum state. *Id.* at 452-53. "Something more" may include a defendant's intentional and knowing transaction of business with

9

residents of the forum state and significant non-internet contacts with the forum state, such as business trips, telephone and fax communications, purchase contracts, and advertisements. *Id.* at 453-54.

The claim-specific jurisdictional inquiry may take yet another form where, again as in the instant case, a defendant is alleged to have committed an intentional tort. *O'Connor*, 496 F.3d at 317 n.2 (citing *Calder v. Jones*, 465 U.S. 783, 789-90 (1984)). The *Calder* effects test "can demonstrate a court's jurisdiction over a defendant even when the defendant's contacts with the forum alone [] are far too small to comport with the requirements of due process under [a] traditional analysis." *Marten*, 499 F.3d at 297 (internal quotation marks omitted); *see also Machulsky v. Hall*, 210 F. Supp. 2d 531, 541 (D.N.J. 2002) (explaining that minimum contacts may be found to be sufficient under either the traditional analysis or *Calder*). Under *Calder*, "an intentional tort directed at the plaintiff and having sufficient impact upon [the plaintiff] in the forum may suffice to enhance otherwise insufficient contacts with the forum such that the 'minimum contacts' prong of the Due Process test is satisfied." *IMO Indus., Inc.*, 155 F.3d at 260. The Third Circuit held that the *Calder* effects test requires a plaintiff to show the following:

> (1) The defendant committed an intentional tort; (2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; (3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity[.]

*Id.* at 265-66 (footnote omitted). To satisfy the third prong of the *Calder* effects test, "the plaintiff must show that the defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum, and point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum." *Id.* at 266.

The *Zippo* and *Calder* analyses are not mutually exclusive. *See Christie v. Nat'l Inst. for Newman Stud.*, 258 F. Supp. 3d 494, 500 (D.N.J. 2017). Stated differently, "whether tortious conduct is committed via the Internet or in more traditional means, does not change the inquiry of the location where [d]efendants purposefully aimed their alleged cyberactivity." *Id.* (citing *Verizon Online Servs., Inc. v. Ralsky*, 203 F. Supp. 2d 601, 612-17 (E.D. Va. 2002); *accord Zippo*, 952 F. Supp. at 1124 (explaining that determinations of minimum contacts should not lead to "[d]ifferent results. . . simply because business is conducted over the Internet")). In fact, both the Third and Ninth Circuits have analyzed internet-based torts under the *Calder* effects test. *See Remick*, 238 F.3d at 257-59; *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1321-22 (9th Cir. 1998). Accordingly, the Court considers the facts of the instant case through both frameworks.

1. **Purposeful Availment**

Under the traditional minimum contacts analysis, the Court first analyzes whether Spamhaus purposefully directed its activities at New Jersey. *See O'Connor*, 496 F.3d at 317. Again, Redi-Data bears the burden to present a *prima facie* case in support of the exercise of jurisdiction. *Carteret Sav. Bank*, 954 F.2d at 150. Here, Redi-Data has not met its burden of showing that Spamhaus purposefully availed itself of New Jersey.

Redi-Data first argues that the global reach of Spamhaus' data and services constitutes purposeful availment of New Jersey. *Id*. at 8-9. Specifically, Redi-Data contends that because Spamhaus provides information to over three billion users, "[l]ogically, the foregoing includes businesses located in or operating in New Jersey and New Jersey Residents." Opp. at 8-9. However, "'the mere operation of a commercially interactive website' does not confer jurisdiction wherever that website may be accessed." *Kim v. Korean Air Lines Co., Ltd.*, 513 F. Supp. 3d 462, 470-71 (D.N.J. 2021) (quoting *Toys "R" Us*, 318 F.3d at 454). Moreover, even if Spamhaus

11

purposefully availed itself of a larger forum that includes New Jersey within it, this does not equate to purposeful availing itself of New Jersey. *See J. Mcintyre Mach. Ltd. v. Nicastro*, 564 U.S. 873, 886 (2011) (plurality opinion) (rejecting the argument that purposeful availment of the United States in its entirety is equivalent to purposeful availment of each of the fifty states).[4] Thus, that users located in New Jersey—among other users worldwide—may access Spamhaus' information is insufficient to establish personal jurisdiction.

Similarly, Redi-Data points to specific ISPs, email service providers, and corporations operating in New Jersey that use Spamhaus' information and services. Opp. at 10; Buckley Decl. ¶¶ 6-21; Carbone Decl. Ex. D, Ex. E. The Court is not convinced that this confers personal jurisdiction over Spamhaus. Redi-Data provides no authority to support its proposition that New Jersey entities' use of Spamhaus' *free* information and services is tantamount to Spamhaus purposefully directing its conduct toward New Jersey. The Order in *DatabaseUSA.com LLC v. The Spamhaus Project*, Civ. No. 19-423 (D. Neb.) cited by Redi-Data is inapposite, as there, the Court found that the defendant was subject to personal jurisdiction in Nebraska because it "knowingly engaged in activities in the State of Nebraska by *selling* internet services to providers who do business in Nebraska." Opp. at 11; Carbone Decl. Ex. G (emphasis added).[5] Moreover, at least one district court has held that "where there is absolutely no degree of commercial activity

---

[4] The plurality also held that "a defendant may in principle be subject to the jurisdiction of the courts of the United States but not of any particular State," *J. Mcintyre Mach. Ltd. v. Nicastro* 564 U.S. 873, 884 (2011), but Redi-Data makes no such argument here.

[5] Additionally, the court made such a finding in the context of a motion for default judgment, and the parties had not briefed the issue of personal jurisdiction. *See* Carbone Decl. Ex. G at 2-3. Redi-Data also references *e360 Insight et al. v. The Spamhaus Project*, Civ. No. 06-3958 (N.D. Ill.), a case in which the defendant was held to have waived its personal jurisdiction. *See e360 Insight v. Spamhaus Project*, 500 F.3d 594, 600 (7th Cir. 2007) (holding that personal jurisdiction had been waived). Spamhaus has not waived personal jurisdiction here.

that actually occurred," the existence of a website that can be accessed by forum residents is "particularly insufficient to justify the exercise of personal jurisdiction." *A.W.L.I. Grp., Inc. v. Amber Freight Shipping Lines*, 828 F. Supp. 2d 557, 569 (E.D.N.Y. 2011).

Redi-Data further argues that Spamhaus "actively investigates business, including…New Jersey businesses." Opp. at 12. In support of this contention, Redi-Data notes that Spamhaus reviewed the website of Redi-Data, a New Jersey company. *Id.* at 13. However, Redi-Data fails to explain how merely reviewing the websites of various businesses, some of which are located in New Jersey, constitutes purposeful availment in the state. Indeed, another district court has found that "the act of visiting a website…does not purposefully avail the user of the protection and benefit of the server state's laws." *NTE LLC v. Kenny Constr. Co.*, Civ. No. 14-9558, 2015 WL 6407532, at *3 (N.D. Ill. Oct. 21, 2015).

Redi-Data additionally notes that "Defendant engaged in electronic communications with companies located in or operating in New Jersey." Opp. at 13. Specifically, Redi-Data refers to communications between Spamhaus, Redi-Data, and ISPs doing business in New Jersey. *Id.* at 14; Buckley Decl. ¶¶ 6-21; Compl. at ¶¶ 37-39. However, these communications were initiated by Redi-Data or its ISPs, not Spamhaus. *See* Buckley Decl. ¶¶ 6-21 (detailing the communications initiated by Redi-Data and noting that Spamhaus' normal procedure was to have the ISP contact Spamhaus). Because minimum contacts "must arise out of contacts that the defendant *himself* creates with the forum State," these communications are insufficient to establish personal jurisdiction. *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quoting *Burger King*, 471 U.S. at 475) (emphasis in original); *see also Helicopteros*, 466 U.S. at 417 ("Such unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction.").

As to the *Zippo* sliding-scale approach, Redi-Data argues that Spamhaus maintains an interactive, rather than passive, website because people or entities may contact Spamhaus through email or Twitter and because Spamhaus offers services to business operating in New Jersey. Opp. at 9. These "interactive aspects," according to Redi-Data, weigh in favor of finding personal jurisdiction. *Id.* (citing *Zippo*, 952 F. Supp. at 1123-24). In the Third Circuit, "interactivity" has been applied to commercial and contractual engagements. *Toys "R" Us*, 318 F.3d at 450 (finding interactivity where a website allowed users to purchase merchandise through it); *Ameripay, LLC v. Ameripay Payroll, Ltd.*, 334 F. Supp. 2d 629, 63 (D.N.J. 2004) (finding insufficient interactivity to permit personal jurisdiction where the website was incapable of executing contracts and forum state users were limited to strictly non-commercial interactions). Here, Spamhaus' website cannot be deemed "interactive" because Spamhaus offers no commercial services and has no commercial contracts. Marin Decl. ¶¶ 5-8; Linford Decl. ¶¶ 18-19.[6] Redi-Data further argues that Spamhaus' website presents users with a link to follow it on Twitter. Opp. at 9; Carbone Decl. Ex. A at 1. However, Redi-Data cites to no authority demonstrating that such a link renders Defendant's website "interactive." And one district court has found that a website is passive even when it displays the company's contact information. *See Lifestyle Lift Holding, Inc. v. Prendiville*, 768 F. Supp. 2d 929, 934 (E.D. Mich. 2011)). Plotted on the *Zippo* sliding scale, Spamhaus' website falls closer to the passive end of the spectrum. *Zippo*, 952 F. Supp at 1124 (noting that "[a]t one end of

---

[6] Redi-Data establishes that an email contact form and fee-based "Datafeed" services are available from the website of Spamhaus Technology. Opp. at 10; Carbone Ex. D at 3-7. However, these commercial services were offered only by Spamhaus Technology, not Defendant. *See* Reply at 5-6; Carbone Decl. Ex. B. Conduct attributable to Spamhaus Technology, rather than Defendant, is not relevant. Redi-Data does not allege Spamhaus Technology to be the Defendant's "alter ego," nor does Redi-Data "provide any facts alleging joint decision-making, shared corporate structure, or 'whether the independence of the separate corporate entities were disregarded.'" *Levy v. Jaguar Land Rover N. Am., LLC*, Civ. No. 19-13497, 2020 WL 563637, at *5 (D.N.J. Feb. 4, 2020).

the spectrum are situations where a defendant clearly does business over the internet," and at the opposite, passive end are "situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions"). Indeed, a Spamhaus blocklist is akin to a passive "listserv" in that it is freely available to users who wish to have its data interact with their inboxes. *See* Linford Decl. ¶ 16; *Barrett v. Catacombs Press*, 44 F. Supp. 2d 717, 728 (E.D. Pa. 1999). Absent "something more," the Court cannot exercise jurisdiction over Spamhaus based on its website or blocklists. *Toys "R" Us*, 318 F.3d at 453 (citing *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 418 (9th Cir. 1997)). Ultimately, Redi-Data has not shown that Spamhaus' internet activity constitutes purposeful availment of New Jersey under *Zippo's* sliding scale approach.

In sum, the Court finds that Redi-Data has not met its burden of establishing that Spamhaus purposefully availed itself of New Jersey.

2. **Relatedness**

Where purposeful availment has not been shown, the Court need not continue its analysis under *O'Connor*. However, even assuming Spamhaus purposefully availed itself of New Jersey, Redi-Data has not satisfied the second prong of the specific jurisdiction inquiry. This prong, the relatedness requirement, asks whether the litigation arises out of or relates to at least one of the defendant's contacts with the forum state. *See Ford Motor Co.*, 141 S. Ct. at 1026. Regarding the defamation and tortious interference claims, Redi-Data has not shown that they are so closely connected to Spamhaus' contacts with New Jersey so as stay within the "real limits" necessary to "adequately protect defendants foreign to a forum." *Id*. The Court agrees that Redi-Data's claims broadly relate to Spamhaus' blocklists. Opp. at 15-16 n.9. However, submitting Spamhaus to the jurisdiction of any forum based on the global accessibility of these lists would far exceed the

foreseeability contemplated in *O'Connor* and "completely erode 'the traditional due process principles governing a State's jurisdiction over persons outside of its borders.'" *Triestman v. Tuerkheimer*, Civ. No. 17-8187, 2018 WL 2433595, at *3 (D.N.J. May 11, 2018) (citing *Young v. New Haven Advoc.*, 315 F.3d 256, 263 (4th Cir. 2002)) (holding that placing information on the internet alone is insufficient to subject that person to personal jurisdiction in each State in which the information is accessed). Likewise, even if the Court were to find sufficient minimum contacts established through the interactivity of Spamhaus' website, Redi-Data does not allege that its claims arise from or relate to the Twitter link provided on the website. *See* Opp. at 9; Reply at 5 n.4. Thus, Redi-Data has not carried its burden of establishing a *prima facie* case of relatedness between the alleged contacts and claims.[7]

### 3. *Calder* Effects Test

Because Redi-Data brings intentional tort claims, the Court also considers whether personal jurisdiction may be exercised under the *Calder* effects test.[8] *See IMO Indus., Inc.*, 155 F.3d at 260 ("[U]nder *Calder* an intentional tort directed at the plaintiff and having sufficient impact upon it in the forum may suffice to enhance otherwise insufficient contacts with the forum such that the 'minimum contacts' prong of the Due Process test is satisfied.") (internal citation omitted). As an initial matter, Spamhaus does not contest whether the first two prongs of the *Calder* test are met. Rather, it argues that the third prong is not satisfied because Redi-Data cannot

---

[7] Because the Court finds that Redi-Data fails to satisfy both the purposeful availment and relatedness prongs, the Court need not address *O'Connor's* final requirement: that the exercise of jurisdiction is consistent traditional notions of fair play and substantial justice. *See O'Connor*, 496 F.3d at 317 ("[I]f the [first] two requirements are met, a court may consider whether the exercise of jurisdiction otherwise comports with fair play and substantial justice.") (internal quotation marks omitted).

[8] Tortious interference and defamation are intentional torts. *See MaxLite, Inc. v. ATG Elecs., Inc.*, 193 F. Supp. 3d 371, 388, 390 (D.N.J. 2016) (tortious interference); *Marten*, 499 F.3d at 298-99 (defamation).

16

show that Spamhaus expressly aimed it tortious conduct at New Jersey. Br. at 16-18; Reply at 11-14.

The third prong of the *Calder* analysis requires a plaintiff to "show that the defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum, and point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum." *IMO Indus., Inc.*, 155 F.3d at 266. Spamhaus argues that there is no allegation that it knew Redi-Data was located in New Jersey or that it intentionally targeted New Jersey. Br. at 16. In support of this argument, Spamhaus points to the Demand Letter sent by Redi-Data's counsel which does not mention New Jersey or indicate that Redi-Data was incorporated and located there. *Id.* at 17. Redi-Data counters that Spamhaus was aware of its location as early as May 2016 because Redi-Data's New Jersey address is listed in its signature blocks; Spamhaus actively communicated with Redi-Data and ISPs operating in New Jersey and investigated Redi-Data's website, which prominently displays the company address; and the New Jersey address of Redi-Data's counsel was clearly displayed in the demand letter sent to Spamhaus. Opp. at 20. Construing the facts in favor of Redi-Data, *see Carteret Sav. Bank*, 954 F.2d at 142 n.1, it can fairly be inferred that Spamhaus was aware that Redi-Data was located in New Jersey.[9] However,

---

[9] The Court notes that merely receiving a demand letter indicating the plaintiff's location is likely insufficient to show that the defendant expressly aimed its tortious conduct at the forum state. For instance, in *Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Hous. Metroplex*, 623 F.3d 440, 446-47 (7th Cir. 2010), the plaintiff argued that "express aiming" could be inferred from the defendant's receipt of a lawyer's cease-and-desist letter that indicated both the nature of the harm and the plaintiff's location. *Id.* at 444. The Seventh Circuit rejected this argument and affirmed the Northern District of Illinois' dismissal for lack of personal jurisdiction. *Id.* at 447. In addition to the lack of authority, the court reasoned that exercising personal jurisdiction on these grounds would be impermissible because it "would make any defendant accused of an intentional tort subject to personal jurisdiction in the plaintiff's home state as soon as the defendant learns what that state is. *Calder* requires more." *Id.*; *see Telemedecine Sols. LLC v. WoundRight Techs., LLC*, 27 F. Supp. 3d 883, 891 (N.D. Ill. 2014) ("[Maintenance of a website accessible in a forum state does not satisfy *Calder*] even where the defendant maintains its website after being placed

Redi-Data has not shown that Spamhaus was aware that Redi-Data "would suffer the brunt of the harm caused by the tortious conduct in the forum." *IMO Indus., Inc.*, 155 F.3d at 266. To the contrary, the harm appears to have been geographically dispersed across the United States and international borders. Spamhaus' blocklist allegedly caused problems with ISPs based in New York, Seattle, Toronto, Philadelphia, Texas, Massachusetts, and Arizona, *see* Buckley Decl. ¶¶ 7-21; D.E. 23-1 ¶¶ 3-15, and with clients "throughout the United States," Compl. ¶ 66.

Even if Spamhaus knew that Plaintiff would suffer the brunt of the harm in New Jersey, Redi-Data must additionally "point to specific activity indicating that [Spamhaus] expressly aimed its tortious conduct at the forum," "such that the forum can be said to be the focal point of the tortious activity." *IMO Indus., Inc.*, 155 F.3d at 266. Here, Spamhaus' blocklists were published on a website accessible to internet users anywhere in the world. Linford Decl. ¶ 23. Simply put, the publication of Spamhaus' blocklists seems more like an "aimless projection into cyberspace" and less like a deliberate action targeted at New Jersey. *Christie*, 258 F. Supp. 3d at 506. Thus, Redi-Data has not shown that Spamhaus expressly aimed its tortious conduct at New Jersey or that New Jersey is the focal point of the tortious activity. *See Realuyo v. Villa Abrille*, Civ. No. 01-10158, 2003 WL 21537754, at *10 (S.D.N.Y. July 7, 2003), *aff'd*, 93 F. App'x 297 (2d Cir. 2004) (finding no personal jurisdiction where defendant's Internet post was not directed towards a potential audience in the forum state "so as to defame the plaintiff in the forum state").

In sum, Plaintiff likewise has failed to establish under the *Calder* effects test that the Court may exercise personal jurisdiction over Spamhaus.

---

on notice of the allegedly harmed entity's identity, location, and ownership of a similar trademark.").

### C. Jurisdictional Discovery

Redi-Data requests in the alternative that the Court grant jurisdictional discovery. Opp. at 23-24. "Although the plaintiff bears the burden of demonstrating facts that support personal jurisdiction, courts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is clearly frivolous." *Toys "R" Us*, 318 F.3d at 456 (internal citations and quotation marks omitted). "If a plaintiff presents factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts between the party and the forum state, the plaintiff's right to conduct jurisdictional discovery should be sustained." *Id.* (internal citations and quotation marks omitted). Moreover, the Third Circuit, in considering jurisdictional discovery requests concerning entity defendants, has recognized the utility of such discovery and expressed a preference for granting it. *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 336 (3d Cir. 2009) (citing *Compagnie Des Bauxites de Guinee v. L'Union Atlantique S.A. d'Assurances*, 723 F.2d 357, 362 (3d Cir. 1983)). Accordingly, the Court will permit jurisdictional discovery. Following discovery, Redi-Data will be given leave to file an amended complaint, and Spamhaus may renew its motion to dismiss.

### IV. CONCLUSION

For the reasons set forth above, Spamhaus' motion to dismiss is **DENIED without prejudice** so that the parties may conduct jurisdictional discovery. An appropriate Order accompanies this Opinion.

Dated: August 2, 2022

_____
John Michael Vazquez, U.S.D.J.